**Toonder v. Lehigh Valley Hospital**

*Timothy S. Kerr,* for plaintiff.
*Brian M. Peters,* for defendants.

FORD, *J.,* May 31, 1995—On March 18, 1995, plaintiff, F. Geoffrey Toonder, M.D., filed a complaint in equity. He simultaneously filed a petition for preliminary injunction which is the subject of this opinion. In the petition, he seeks an injunction reinstating his surgical privileges at the defendant, Lehigh Valley Hospital, and to otherwise compel LVH to comply with the terms of a document entitled agreement of settlement and release dated November 18, 1994. This opinion is entered in support of the preliminary injunction which was granted by the court on April 27, 1995. Final hearing on the merits is scheduled for July 5, 1995.

## PROCEEDINGS PRELIMINARY TO INJUNCTION HEARING

After the complaint in equity was filed on March 18, 1995, the Honorable Robert K. Young of this court signed the rule to show cause requesting enforcement of settlement agreement and for other equitable relief on March 21, 1995. The rule contained, in its final paragraph, provisions granting the plaintiff injunctive relief in that it compelled LVH to allow the plaintiff's active staff privileges to remain effective after the date

of April 1, 1995. After the entry of this rule, Judge Young recused himself from further involvement in the case. The case was thereafter assigned to the author of this opinion.

On April 13, 1995, after a discussion in chambers with the attorneys for the parties, an order was entered by this court rescinding the rule to a show cause and order of March 21, 1995 with the effect that the court was no longer mandating continuation of Dr. Toonder's active staff privileges. The injunction was lifted because, in chambers, counsel for plaintiff was not able to satisfy the court that appropriate notice had been given to counsel for the defendants of the presentation of the rule to show cause signed on March 21, 1995. Specifically, that rule contained a paragraph for injunctive relief. On the record, at the hearing of April 18, 1995, counsel for the plaintiff was provided the opportunity to demonstrate that the appropriate notice had been given to the defendants. No such demonstration was made. Accordingly, the injunction was lifted as required by Pa.R.C.P. 1531(d) which provides:

"An injunction granted without notice to the defendant shall be deemed dissolved unless a hearing on the continuance of the injunction is held within five days after the granting of the injunction or within such other time as the parties may agree or as the court upon cause shown shall direct."

The injunction was dissolved but the plaintiff was provided with the opportunity for hearings on his request for an injunction which hearings were conducted on April 18 and 19, 1995.

### Dr. Toonder and His History With Lehigh Valley Hospital

The plaintiff, F. Geoffrey Toonder, M.D., is a cardio-thoracic surgeon. For purposes of the injunction hearing,

the parties stipulated that he is a qualified cardio-thoracic surgeon. Dr. Toonder has performed these surgery duties at LVH since 1976. While he has courtesy privileges at other hospitals, it is only at LVH that he performs cardio-thoracic surgery. This compromises approximately one-half of his medical practice.

It was evident from his testimony that, he not only receives a substantial portion of his income from his work as a surgeon, but he also achieves a great deal of personal satisfaction from this aspect of his profession.

LVH has implemented a hospital staff development plan, through its board of trustees, whereby LVH creates a limited number of what are known as "manpower slots" in each specialty and subspecialty due to LVH's perception of hospital resources and needs.

In approximately March 1993, Dr. Toonder, who had a manpower slot himself, applied to LVH for an additional manpower slot so that he could bring in an associate with him to replace a Dr. Fox who had left his practice. In July 1993, LVH advised Dr. Toonder that an active medical staff slot in the department of surgery, division of cardio-thoracic surgery, was granted to him for a period of one year. Thereafter, Dr. Toonder sought to fill that slot with a Dr. Villars, a cardio-thoracic surgeon.

The credentials of Dr. Villars were presented by Dr. Toonder to LVH. In February 1994, LVH rescinded the manpower slot that was granted to Dr. Toonder in July 1993. In essence, Dr. Villars could not be granted active privileges at LVH through this manpower slot. This resulted in equity litigation brought by Dr. Toonder against LVH. The differences of the parties were resolved by way of a certain document entitled agreement

of settlement and release which was approved by the court on November 18, 1994.

Paragraph 2 of the agreement reads:

"(2) Lehigh Valley Hospital Inc. shall award to plaintiff one active manpower slot in the department of surgery, division of cardio-thoracic surgery, for a period not to exceed the shorter of (i) nine months from the date of the execution of this agreement of settlement and release, or (ii) submission to Lehigh Valley Hospital of a completed application for medical staff membership and clinical privileges by a physician chosen by plaintiff. Any completed application submitted pursuant to this paragraph shall be given fair consideration and shall be treated as any other application for medical staff membership and/or clinical privileges, subject to the corporate and medical staff bylaws, as well as any other rules and regulations, policies or procedures, or the like, now existing or subsequently adopted by Lehigh Valley Hospital Inc. and/or the medical staff."

The plaintiff contends that LVH violated the provisions of this paragraph 2 in the fashion in which it acted upon an application submitted under this paragraph by Richard Angelico, M.D. It is that contention that brings the parties before the court.

On March 9, 1994, the Board of Trustees of LVH adopted what was known through the hearings as the "numerosity requirement." In order to maintain cardiac privileges within the division of cardio-thoracic surgery, surgeons must perform a minimum of 50 cardiac surgeries annually. The standard went into effect on April 1, 1994. It was raised to 75 on April 1, 1995. It will be raised to 100 cases on April 1, 1996. Under this policy, if a physician fails to satisfy these minimum numerical standards, he or she is considered by LVH to have voluntarily relinquished cardiac surgery privi-

leges. Plaintiff is subject to this policy so that he had to perform a minimum of 50 cardiac surgeries between April 1, 1994 and March 31, 1995, in order to maintain privileges.

We now examine the relationship of the manpower slot concept and the numerosity requirement to plaintiff's practice in the 1990s.

Plaintiff was in practice with a cardio-thoracic surgeon, Dr. Fox, until a date in 1991 when Dr. Fox left the practice. A Dr. Boyer temporarily filled the manpower slot previously occupied by Dr. Fox for dates in 1992 and 1993. In 1993, Dr. Boyer left the practice of plaintiff. Plaintiff then actively sought, for a variety of reasons, a cardio-thoracic surgeon to join him in practice. The search led to Dr. Villars. As has been seen, Dr. Villars' application was not considered by LVH because of the rescission of the manpower slot by LVH under which Dr. Villars sought privileges. This occurred in February 1994. This manpower slot was restored to plaintiff in November 1994 through the agreement. Even during the interval between February 1994 and November 1994, plaintiff continued to recruit a qualified cardio-thoracic surgeon to join him in practice.

There are several reasons that plaintiff sought an associate surgeon for his practice. Quality of care for the patient is enhanced generally. Coverage for the patient's primary physician is consistent and reliable in that coverage will be provided by the associate rather than by a number of other physicians not associated with a primary practice. Referrals by cardiologists to a cardio-thoracic group, rather than a sole cardio-thoracic practitioner, increase because the referring cardiologists can rely upon better coverage for the primary surgeon. The referring cardiologist also feels more se-

cure in his referrals to the surgery group. He knows the personalities and the qualifications of the surgeons who will be treating the referred patient, eliminating the uncertainty of personalities and qualifications of covering surgeons that occurs when the surgeon to whom the referral is made is in sole practice with the necessary myriad of back-up surgeons. Plaintiff was aware of these benefits to practice with an associate or associates.

In addition to these advantages of practice with another, his need to bring in an associate was heightened when LVH adopted the numerosity requirement. This is seen by comparing the numerosity thresholds with plaintiff's estimate that he performed, on an average, four to five cardiac surgeries per month. It appeared to plaintiff that he would receive these benefits of association with another surgeon when Dr. Richard Angelico met to discuss association in August or September 1994.

### Dr. Richard Angelico

The clinical experience and some events in Dr. Richard Angelico's life are relevant here. He began working as a cardio-thoracic surgeon in 1986. From 1986 to 1989, he had full active privileges at LVH. In 1989, by request, his privileges were converted from full active to courtesy privileges. With courtesy privileges, he is permitted to perform up to 12 surgeries per year. During the period from 1989 until October 15, 1994, on which latter date LVH considered Dr. Angelico to have "voluntarily resigned" his courtesy privileges, Dr. Angelico performed cardio-thoracic surgery at another area hospital, St. Luke's. Dr. Angelico voluntarily resigned his active privileges at St. Luke's Hospital on March 5, 1994. However, in his years at St. Luke's Hospital,

he performed a high volume of cardio-thoracic surgery which included 244 separate procedures during his last year of active surgery at St. Luke's. Evidence was presented that he performed more cardio-thoracic surgeries than any other one individual in the Lehigh Valley area.

Cardio-thoracic surgery generates considerable income for the hospital at which it is performed. Thus, Dr. Angelico is a likely source of substantial income for any hospital at which he practices as is evidenced by the 244 surgeries performed in the year before he left St. Luke's.

Dr. Angelico also has a large referral base which is primarily from cardiologists located in Monroe County, Bethlehem, Pennsylvania, and cardiologists at LVH.

It was on March 5, 1994 that Dr. Angelico voluntarily resigned from St. Luke's Hospital. He did that because he felt that he could not safely do surgeries there because the hospital did not give him the support that he needed for them. He felt that the safety of patients could be compromised by this lack of support. Dr. Angelico's reaching this conclusion arose out of an unfortunate operating room incident or incidents involving a certain perfusionist. When difficulties arose with this perfusionist, St. Luke's did not provide Dr. Angelico with the support to which he felt he was entitled in dealing with this perfusionist.

In July 1994, Dr. Angelico received a letter from LVH reinstating his courtesy privileges at LVH, for a two-year period from 1994 to 1996.

In late August 1994, Dr. Angelico met with defendant, John Hart. Mr. Hart performs various functions for LVH. His title is vice president for medical staff services which position he has occupied for six years.

In this discussion of August 1994, Dr. Angelico told Mr. Hart of his desire to transfer from courtesy status to active status at LVH. Dr. Angelico was under the impression that it would be rather routine to make such a transition. Mr. Hart advised him that it would not be routine. He told him that he had virtually no chance of receiving an independent manpower slot for full active privileges as a cardio-thoracic surgeon in that Dr. Angelico was in sole cardio-thoracic practice. Mr. Hart suggested to Dr. Angelico that he make application for active privileges through Dr. Toonder's manpower slot. Interestingly, the Dr. Toonder manpower slot was rescinded in February 1994 and was not reinstated until the agreement of November 18, 1994. Mr. Hart indicated to Dr. Angelico that the Toonder slot might be restored in the future. Thus, at the time of this discussion in August 1994, there was no Dr. Toonder slot through which Dr. Angelico could make application.

Dr. Angelico explained to Mr. Hart in the course of this discussion circumstances pertaining to his resignation from St. Luke's including that he was forced to work with a perfusionist against his wishes. He questioned the perfusionist's competence. He stated that St. Luke's Hospital was not supportive of Dr. Angelico's efforts in dealing with this perfusionist. He described for Mr. Hart that he feared that this lack of support by that hospital would affect the quality of care for his patients. Consequently, he voluntarily resigned.

Dr. Angelico applied for an independent slot despite the advice of Mr. Hart. This application was denied by letter dated December 28, 1994 from LVH, signed by Mr. Hart. The letter was postmarked January 12, 1995 and received by Dr. Angelico on January 15, 1995.

After this meeting with Mr. Hart, Dr. Angelico contacted the plaintiff in late August or early September

1994 to inquire if plaintiff was interested in a medical practice arrangement with Dr. Angelico. Plaintiff was interested. In fact, plaintiff submitted an offer to Dr. Angelico to join him in practice in late September 1994. While the details, including financial details, of their association had not yet been finalized, these two physicians agreed that they would form an association for the practice of medicine, including cardio-thoracic surgery.

### Dr. Angelico's "Voluntary Resignation" of His LVH Privileges

In October of 1994, Dr. Angelico lost his courtesy privileges at LVH. It occurred because of late payment of medical staff dues.

The medical staff bylaws which were in effect at LVH for the relevant periods in 1994 and 1995 are identical to those medical staff bylaws (dated February 1, 1995) found as exhibit "D" to defendants' answer to plaintiff's petition to enforce settlement agreement and for other equitable relief. The parties stipulated that these were the effective provisions during those two years.

It is provided at article IV, section A, paragraph 5 of the bylaws:

*"DUES:* To finance the activities of the medical staff, dues shall be assessed for the members of the medical staff as defined in each category. The dues shall be for a fiscal year and shall be billed on September 1 of each year. Only one certified reminder letter will be sent to the staff member for return of dues 10 days prior to the October 15 deadline. Any member whose dues are not paid in full by October 15 shall be considered to have voluntarily resigned from the medical

staff effective on that day not entitling the practitioner to the applicable provisions of the fair hearing and appellate review process. In order to regain his or her staff privileges, he or she must make a full payment of his or her dues, and then reapply for staff membership in the usual manner. The treasurer will append the copy of this paragraph to an affected practitioner's final billing. . . . "

Produced at the hearing was exhibit "D-3" which is a letter bearing the date of September 1, 1994. The defendants presented this as the September 1 billing letter to Dr. Angelico required under the bylaws. We note that exhibit "D-3" does not have attached to it the copy of the above-quoted portion of the bylaws pertaining to the annual billing. *Such attachment is required under the bylaws.* More than 600 of these letters were sent to the LVH physicians.

Mr. Hart testified that LVH sent the September 1 letter to Dr. Angelico. However, Dr. Angelico testified he never received the original of "D-3."

Mailing procedure by LVH is less than exact. This was corroborated in several respects. First of all, there was the believable testimony of Dr. Angelico that he has routinely received, over a period of time, letters from LVH dated significantly earlier than the postmark. The one example demonstrated at hearing was a letter from LVH, specifically from Mr. Hart, bearing the date of December 28, 1994 which has a postmark date of January 12, 1995 and was received by Dr. Angelico on January 15, 1995. This was exhibit "P-6." Mr. Hart explained the gap between the date on that letter and the postmark as probably being delayed by the holidays but also that this was mail that was not personally supervised by him in that it was routine rather than time significant like the letters dated September 1, 1994

and the hereinafter discussed letter bearing the date of October 3, 1994 pertaining to the annual dues owed by Dr. Angelico. In essence, there is question about the timeliness and reliability of mailings from LVH, particularly as to the letter bearing the date September 1, 1994. (Exhibit "D-3.")

Mr. Hart testified that he personally supervised the mailing of the dues reminder letter required under the bylaws which letter bears the date of October 3, 1994. (Exhibit "D-4.") While we note his testimony that he supervised the mailing, he also said this letter was sent *on or before* October 3. The original of exhibit "D-4" shows a signature acknowledging receipt of the letter by the office of Dr. Angelico on October 11, 1994. Dr. Angelico personally was told of the letter on October 13, 1994. The letter required the payment of the dues check by October 15, 1994.

A $200 check for the medical staff dues bearing the date of October 13, 1994 was mailed by Dr. Angelico to LVH. However, the time stamp on the envelope for this check is dated October 31, 1994. (Exhibit "D-15.") It is clear to the court that Dr. Angelico presented the check beyond the October 15, 1994 date.

As a result of submission of the check for dues beyond the October 15 date, LVH, in the person of John Hart, considered Dr. Angelico to have "voluntarily resigned" his courtesy staff privileges at LVH. Mr. Hart then embarked on the process of having the appropriate parties at LVH accept this "voluntary resignation."

Dr. Angelico learned from Dr. Toonder on November 1, 1994 that his check was not being accepted and that he was considered as a "voluntary resignation." Dr. Toonder learned of this from a conversation that he had with Mr. Hart.

In response, Dr. Angelico forwarded the original of exhibit "P-3" to Mr. Hart stating his objection to the revoking of his courtesy privileges and indicating that this was not a voluntary resignation by him. This letter was forwarded on November 10, 1994.

The fashion in which the resignation of the courtesy privileges was handled by Mr. Hart is controversial among LVH staff members. Mr. Hart testified that strict compliance with the dues provisions of the bylaws is required in order to maintain the "process" and to replenish the treasury of LVH or the medical staff. He claims that many physicians have lost privileges at LVH, not only those who have chosen to relocate and therefore not to pay the fee for an additional year, but also those who have either refused or neglected to timely pay the fee. It was his testimony that LVH has not bent the requirements of this aspect of the bylaws.

Mr. Hart's testimony was contradicted by the testimony of Dr. John Kibelstis.

Dr. Kibelstis has been a staff member at LVH for 22 years. He has worked as a member of the credentialing committee and also the bylaws committee. He is a past president of the medical staff (1988). He stated that, if medical dues were missed in the past by staff members, the person would not be suspended of privileges without an inquiry by the staff. This was particularly true when the staff was aware that the physician wanted to remain as a member of the staff. The bylaws were simply not strictly enforced in this regard.

Significant on this point was the testimony of Dr. Joseph Candio. From February 1995, he has been the chair and a member of the credentialing committee. He was a member of the medical executive committee and other committees in 1994. Dr. Candio was called by the defense particularly as to his opinion that the

application of Dr. Angelico, which will be hereinafter discussed, was incomplete, an opinion upon which the defendants placed considerable reliance as a demonstration that the application was incomplete. Dr. Candio sat with the medical executive committee when it accepted the "voluntary resignation" of Dr. Angelico for late payment of the fee. Several times in the course of Dr. Candio's testimony, he made reference to the qualifications of Dr. Angelico by referring to him as a highly competent physician. It is equally clear that the circumstances under which Dr. Angelico was considered by Mr. Hart to have "voluntarily resigned" was not explained to the members of the medical executive committee. Dr. Candio testified that he was not aware, when he sat as a member of that committee which had to act on the "voluntary resignation," that Dr. Angelico was objecting to the termination. He testified that it would have struck him as odd if he had known that it was through inadvertence in submitting the check late that Dr. Angelico was considered a "voluntary termination." What the record does not reflect but was seen when Dr. Candio stated this was his surprise that such could have been the circumstances of the resignation.

From August 1994, LVH, through Mr. Hart, knew of the potential and then even planned association of Dr. Angelico with Dr. Toonder. There are several indicators of this, for example, the discussions of Dr. Angelico with Mr. Hart in late August 1994 and the fact that it was Mr. Hart who advised Dr. Toonder of the "voluntary resignation" in early November 1994.

Dr. Toonder would gain a significant advantage in attempting to meet the numerosity requirements of LVH at the point that his association with Dr. Angelico became effective. This is made clear by the extensive surgical

practice of Dr. Angelico, the largest of any one physician in the Lehigh Valley; the need for coverage by Dr. Angelico which would necessarily be provided by Dr. Toonder at the point that Dr. Angelico achieved full active status and the association with Dr. Toonder was complete; the extensive referral base of Dr. Angelico; and his reputation among the physicians for competence as a cardio-thoracic surgeon. LVH knew the substantial advantage to Dr. Toonder of any association with Dr. Angelico.

### Dr. Angelico's Applications For LVH Privileges

After Dr. Angelico's being advised of the "voluntary resignation" he considered a number of options to establish active privileges at LVH. The one option pursued by him, against the advice of Mr. Hart, was the submission of an application for a manpower slot as a sole practitioner. As predicted by Mr. Hart, that application was rejected by means of the letter dated December 28, 1994 but received by Dr. Angelico on January 15, 1995. Almost simultaneous with the submission of that application, Dr. Angelico submitted an application for the Toonder manpower slot which became available through the agreement. It is LVH's processing of Dr. Angelico's application for the Toonder slot that is the immediate subject of this litigation. What follows is the chronology of the processing of Dr. Angelico's application for the Toonder slot:

*November 6, 1994:* Dr. Angelico received the application for the Toonder slot on November 3, 1994. He submitted the completed application ("D-2") for the slot to LVH on November 6, 1994.

*November 10, 1994:* John Hart forwarded a recommendation form and letter. (Exhibit "F" to defendant's answer.) This contains responses by St. Luke's to all

questions asked on the form by LVH including: "Dr. Angelico resigned from our staff. Only he can provide the reasons for his resignation." This exhibit contains a stamp marked "LVH Medical Staff dated November 22, 1994."

*December 19, 1994:* A letter ("D-8") was sent from Mr. John Hart to Dr. Richard Angelico advising that LVH is asking St. Luke's for an elaboration concerning Dr. Angelico's competency and professional conduct. The letter also requests that Dr. Angelico provide the identity of someone at St. Luke's to confirm the facts of resignation. On the same date Mr. Hart also sent a letter ("D-7") to Charles D. Saunders, M.D., of St. Luke's asking for an elaboration on the events surrounding the resignation and other matters. These letters of December 19 were forwarded 39 days after the recommendation form was first forwarded to St. Luke's and 27 days after LVH received the completed recommendation form from St. Luke's.

*December 22, 1994:* Dr. Angelico sent a letter ("D-9") to Mr. Hart bearing the date of December 22, 1992 (note typographical error). In this letter Dr. Angelico advised that there were no "clinical, behavioral or other professional conduct issues pending" at the time of his resignation from St. Luke's or at any time prior to the resignation. Dr. Angelico reiterated his competency as a surgeon and physician. Dr. Angelico did not direct Mr. Hart to any specific individual at St. Luke's but rather indicated that Mr. Hart is free to contact "any physician, nurse, ward-clerk or orderly" at St. Luke's to confirm his competency.

*January 5, 1995:* Charles D. Saunders, M.D., St. Luke's vice president of medical and academic affairs, sent a letter ("D-16") indicating that the resignation by Dr. Angelico from St. Luke's and, as stated in re-

sponse to the November 10, 1994 recommendation form, Dr. Angelico will have to be questioned as to the reasons for his resignation. Dr. Saunders again stated, as St. Luke's did with the recommendation form, that Dr. Angelico was not under investigation or evaluation and there was no particular incident to question his competency. He also stated in this letter that the resignation of Dr. Angelico was not requested by the hospital. This letter bears a stamp dated January 9, 1995 "Medical Staff Services Lehigh Valley Hospital."

*January 27, 1995:* Mr. Hart signed a letter ("D-10") bearing this date to Dr. Angelico. The letter asks Dr. Angelico to provide a written explanation of the reason or reasons that he resigned from St. Luke's. He asked for a statement as to whether there is any agreement of confidentiality between Dr. Angelico and St. Luke's. Another letter ("D-17") was signed by Mr. Hart bearing that same date addressed to Dr. Saunders. In the letter, Mr. Hart asks Dr. Saunders to give a written explanation of any incident surrounding Dr. Angelico's resignation. He asked for a statement as to whether there is an agreement of confidentiality. These letters are dated 39 days after the December 19 letters. They were also sent 22 days after the January 5, 1995 response from Dr. Saunders and 18 days after it appears that Dr. Saunders' response was received at LVH.

*February 13, 1995:* Dr. Angelico hand-delivered a letter ("D-11") to LVH confirming that there is no confidentiality agreement. The letter also provides details of the incident with the perfusionist which precipitated the resignation by Dr. Angelico.

*February 16, 1995:* A letter ("D-12") bearing this date was forwarded by LVH (with someone signing for Mr. Hart) to Dr. Saunders asking Dr. Saunders to respond, apparently with either an affirmation or denial,

to Dr. Angelico's letter of February 13, 1995, a copy of which was forwarded with this February 16 letter.

*February 22, 1995:* A letter (Exhibit "L" to defendants' answer) was sent from Dr. Saunders to Mr. Hart advising that he has nothing further to add to prior reports in that he had previously responded fully.

*February 27, 1995:* A letter ("D-13") bearing this date was sent from Mr. Hart to Dr. Angelico advising that St. Luke's is continuing to fail to give information and suggesting that Dr. Angelico contact St. Luke's to encourage a response.

*February-March 1995:* On a date between February 22 and March 21, 1995, Attorney Joseph Bubba, counsel for LVH, had a lunch meeting with Attorney Barbara Blackmond, the attorney for St. Luke's, to make a personal request that St. Luke's provide additional responses.

*March 21, 1995:* A letter (Exhibit "M" to defendants' answer) bearing this date was sent from Dr. Saunders to Mr. Hart. It states that Dr. Angelico's decision to resign from St. Luke's was his own decision and not the result of any "agreement" involving St. Luke's. It stated that there is no agreement involving St. Luke's that would "preclude the provision of credentialing verification information. Such verification has been provided." The letter indicates that St. Luke's does not know how, if at all, an "incident" factored into Dr. Angelico's decision to resign. It confirmed that that decision was personal and unilateral. It confirmed that clinical competence of Dr. Angelico has never been questioned. It indicates that, at the time of resignation, Dr. Angelico was not under investigation or threat of investigation.

With the receipt of the March 21, 1995 letter, exhibit "M," Mr. Hart, with the advice of counsel, considered

Dr. Angelico's application complete. For the first time, Dr. Angelico's application was submitted to the credentialing committee in April 1995. Mr. Hart consulted with Dr. Candio of that committee prior to April 1995 and Dr. Candio likewise felt that the application was incomplete. In April 1995, shortly before the conducting of the court hearings in this case, the credentialing committee approved Dr. Angelico's application for full active privileges. The application has been submitted to the medical executive committee which meets on a date in May 1995. If the application is approved by that committee, Dr. Angelico is eligible for temporary privileges. The Board of Trustees of LVH will act upon the application in June 1995, assuming approval by the medical executive committee.

### Categories of LVH Privileges and Bylaw Provisions

It is necessary to define the various types of privileges which have been identified during the course of the hearings. These are addressed in the bylaws. Those with *active* medical staff privileges may, among other things, admit patients without limitation and exercise such clinical privileges as may be approved by LVH. The *courtesy* staff may have "no more than 12 patient contacts annually." Under the testimony, those who are granted *temporary* privileges can admit patients without limitation and exercise clinical privileges approved by LVH for the period of time that the temporary privileges are in effect. These and the other categories of the medical staff are defined in article IV of the bylaws.

Much testimony was received pertaining to the applicant's burden in processing the application. This is specified in article VI, section B, 3(a), page 14, of the bylaws. Under this provision, the applicant has the

burden of producing accurate and adequate information for a proper evaluation of experience, background, training, demonstrated ability, physical and mental status and all other qualifications and for resolving any doubts about these matters.

There exists a concomitant obligation on the part of LVH, specified in article VI, section B, 3(b), page 14, which requires the medical staff office to: "in timely fashion, seek to collect and verify the references, licensure and other qualification evidence submitted." Under this provision, medical staff services must promptly notify the applicant of any problem in obtaining the information required and it then becomes the applicant's obligation to obtain the required information. However, the obligation to collect and verify evidence is clearly upon LVH. Likewise, the bylaws do not address the obligation of LVH in the event that it takes upon itself the burden of verification rather than returning that burden to the applicant. Mr. Hart stated several times that the medical staff office, through him, continued to be involved in the verification process as a *courtesy* to both Drs. Toonder and Angelico in that they were staff members. In doing this, Mr. Hart deviated from a strict adherence to the bylaws. In doing so, it is fair to require that LVH act expeditiously and in good faith, particularly when one considers the grave consequences for Drs. Toonder and Angelico if LVH does anything less.

### DISCUSSION

#### *The Standard*

We embark upon the inquiry of whether plaintiff is entitled to a preliminary injunction under these facts by making reference to what must be established in

order to demonstrate entitlement to a preliminary injunction. The requirements were succinctly stated in *Schaeffer v. Frey,* 403 Pa. Super. 560, 589 A.2d 752 (1991) as follows:

"In Pennsylvania, a preliminary injunction will be granted only where a party can demonstrate certain prerequisites. There must exist (1) a threat of immediate and irreparable harm that cannot be remedied by damages; (2) the injury that would result by denying the injunction must be greater than the injury by granting the equitable relief; and (3) the grant of the injunction must properly restore the parties to the situation as it existed prior to the alleged wrongful conduct. (citations omitted) Underlying these three requirements, a court, sitting in equity, will not grant an injunction unless the conduct sought to be enjoined is actionable and an injunction can, in fact, restrict the conduct." (citations omitted) *Id.* at 565, 589 A.2d at 755.

As to whether the conduct is actionable, it has been stated that: "[U]nless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will not generally be awarded." (citations omitted) *Singzon v. Commonwealth Department of Public Welfare,* 496 Pa. 8, 11, 436 A.2d 125, 127 (1981), (citing, *John G. Bryant Co. v. Sling Testing & Repair Inc.,* 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977); *New Castle Orthopedic Association v. Burns,* 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978)).

While we are mindful of equity's many principles, we recognize that the court of equity is not the forum for largess. Rather, when equitable relief is granted, it is based upon entitlement by statute or precedent.

The defendants have classified the subject petition as an improper attempt by the plaintiff to enlist the court in the "micro-management of the hospital's staff-

ing arrangements," as an "invitation to act, under the aegis of its equity powers, as a super-hospital administrator." Defendants label this action a "frontal assault on hospital self-governance." The decision granting the injunction is none of these. Rather, it is generated by the sufficient showing by the plaintiff that he is entitled to injunctive relief under the appropriate standard because LVH has not given "fair consideration" to the application of Dr. Angelico for the Toonder slot as required under the agreement. A sufficient showing has been made of a violation of the agreement that compels this court of equity to act so that greater harm does not result.

As stated, the plaintiff must demonstrate a threat of immediate and irreparable harm that cannot be remedied by damages. We accept the testimony of Dr. Toonder as to the impact that the loss of privileges would have upon him. Dr. Toonder testified that the loss of privileges would generate 50 percent less income with devastating impact including the necessity of selling his home. While it is difficult to tell whether the impact will be devastating and whether it will result in the selling of his home, we are satisfied that there is a significant monetary impact for Dr. Toonder with the loss of privileges. More significant for the inquiry at hand is the fact that the nature of his practice would be greatly affected. During the hearings, LVH was classified as the premier facility for the performance of cardio-thoracic surgery in this geographic area. Dr. Toonder testified convincingly, particularly after consideration of all of the other evidence, that if his surgery privileges are lost through the present process, in all likelihood, they will never be restored at LVH. Thus, referrals to a surgeon who can no longer practice at the "premier facility" will be affected. A loss of privileges in this fashion will impact upon the

reputation of Dr. Toonder. A cloud of uncertainty will arise within the profession about a physician when it becomes known that his privileges have been lost. The loss of privileges will result in the loss of an association with Dr. Angelico and the vast potential for growth that such joinder of resources has. Finally, we took from the testimony of Dr. Toonder that he takes great pride in his surgery practice. Consequently, there will be the loss of personal satisfaction and fulfillment as to which there is no adequate remedy at law.

We also note and accept plaintiff's argument that the revocation of privileges will work to the detriment of long-standing patients. Individuals who are already patients of Dr. Toonder may be precluded from choosing him as their heart surgeon because of either the revocation of the privileges here or the necessity of his relocating in order to perform similar surgery, assuming that like privileges are granted elsewhere.

Second, the plaintiff must demonstrate that the injury that would result by denying the injunction must be greater than the injury by granting the equitable relief. It must be remembered that, for purposes of this injunction hearing, there was a stipulation as to the competency of Dr. Toonder to perform the cardio-thoracic surgery. If the active privileges are revoked, that is, if the injunction were not granted, the injury for Dr. Toonder and the patients is significant as was described in the two immediately preceding paragraphs. Additionally, with any denial of the injunction, LVH is permitted to undermine the requirement that it give "fair consideration" to any application submitted under the Toonder slots, as required by the agreement. As will be hereinafter discussed, such fair consideration was not given. The court cannot countenance the thwarting of the obligation that LVH took upon itself by entering

this agreement. Denial of the preliminary injunction will permit the undermining of that agreement. Thus, considerable harm occurs with the denial of a preliminary injunction. With the granting of the preliminary injunction, Dr. Toonder, the surgeon whose competence was admitted by the parties, can continue to perform surgeries at LVH, a career will not be hampered by improper obstacles and it appears that he will have the advantage of an association with Dr. Angelico which will greatly enhance the number of surgeries that he can perform to the benefit of patients. Greater injury would result by the denying of the injunction than by granting it.

The third requirement is met as well. Prior to April 1, 1995, Dr. Toonder was performing surgeries. He was bound by the numerosity requirement. He had performed 33 surgeries of the required 50 but he was hampered by obstacles created for him in his surgery practice by LVH. The granting of the injunction will provide him the opportunity to again perform the surgeries but, this time, unencumbered by the improper obstacles created by LVH so that an appropriate determination can be made as to whether he meets the numerosity requirement. The only way to restore the parties to the situation that existed prior to the alleged wrongful conduct is to grant the injunction.

We turn then to a consideration of whether the activity sought to be restrained is actionable, whether the injunction is reasonably suited to abate the activity and whether the plaintiff's right is clear and the wrong is manifest. In this regard, the motive of LVH is relevant.

## MOTIVE OF LVH

Dr. Toonder testified that LVH is acting in bad faith in that it is attempting to exclude solo practice surgeons

from LVH facilities in favor of large medical groups. If that is a goal of LVH, that is not, per se, illegal or improper. However, LVH has presented to the court that the only reason for handling Dr. Angelico's application in the way that it has is because of noncompliance with the bylaws. The evidence demonstrates that there is more to it than that and that Dr. Toonder's suspicions have foundation.

A first point of corroboration of this was the conversation between Mr. Hart and Dr. Angelico in late August 1994. Dr. Angelico expressed the desire to apply for an active medical staff position as a sole practitioner. Mr. Hart promptly responded that, as a sole practitioner, he had virtually no chance to have such a slot approved.[1] The statement made by Mr. Hart to Dr. Angelico is evidence of a preference by LVH of groups over sole practitioners.

LVH has seen fit, perhaps appropriately so, to view numbers of surgeries as enhancing proficiency. It therefore established the numerosity requirement. LVH has known that Dr. Toonder and Dr. Angelico were pursuing practice together throughout the process of the loss of Dr. Angelico's courtesy privileges and the processing of the application of Dr. Angelico for the Toonder slot. Clearly an association by Dr. Toonder with Dr. Angelico would make the meeting of the 50 surgery requirement before April 1, 1995 a relatively easy matter. Because of the surgery record of Dr. Angelico and his large referral base, it is likely that meeting the numerosity requirement would not henceforth be a problem for Dr. Toonder if the planned association were permitted to become a reality. If one assumes that Drs. Toonder

---

1. Mr. Hart remembered telling Dr. Angelico that, for such a manpower slot, he had a "snowball's chance in hell."

and Angelico are competent, which is the evidence in this case, and that both positioned themselves in the latter part of 1994 to enhance competency with increased numbers of surgical procedures, which they did, one would expect a LVH satisfied that two of its physicians have arranged to continue to hone surgery skills by easy compliance with the annual numerosity requirements and a LVH cooperative to bring such a beneficial association to fruition. Instead, what is seen is a hyper-technical interpretation of the bylaws by LVH when it has not demonstrated exact compliance itself, all to the detriment of these two physicians in a way that would have particularly devastating implications for Dr. Toonder. Thus, we find that the motive of LVH in revoking the courtesy privileges of Dr. Angelico and in its dilatory consideration of his application, submitted in November of 1994 and still undergoing consideration, was based upon more than just the desire to comply with the bylaws.

### *Revocation of Dr. Angelico's Privileges*

Revocation of the courtesy privileges of Dr. Angelico is addressed not only because it impacts upon Dr. Toonder's standing with the hospital but also because LVH knew that it would have a negative impact upon Dr. Toonder.

Dr. Kibelstis presented believable evidence that LVH, in the past, has not strictly enforced the dues requirement under the bylaws. In the past, when a person missed the payment of the annual dues, the person was not suspended without an inquiry by the staff. Even Dr. Candio, the present chair of the credentialing committee and a member of the medical executive committee when the "voluntary resignation" of Dr. Angelico was submitted to that committee, demonstrated incredulity at

the possibility that all the circumstances of Dr. Angelico's "resignation" were not submitted to the medical executive committee in 1994. Dr. Candio expressed genuine surprise. The circumstances of nonpayment of the dues were not fully and fairly presented to Dr. Candio and the members of the medical executive committee. Had they been explained, the result very well may have been that the courtesy privileges would not have been lost and Dr. Toonder would have benefitted in that the association with Dr. Angelico could have been completed at an earlier date. Such an assumption is not unreasonable in view of the fact that LVH permitted physicians to remain on staff in the past under circumstances not unlike Dr. Angelico's.

### *LVH's Processing of Dr. Angelico's Toonder Slot Application*

As to the processing of Dr. Angelico's application for the Toonder slot, we do not fault LVH for third party confirmation of competency issues. That is required hospital policy and practice for the reasons fully explored at hearing. Rather, it is the lack of speed and the fashion in which LVH chose to confirm the circumstances under which Dr. Angelico left St. Luke's with which we take issue.

The application of Dr. Angelico was submitted on November 6, 1994. From that date through March 31, 1995, each day was critical to Dr. Toonder who had to meet the numerosity requirement. LVH certainly understood that Dr. Toonder benefitted from the earliest possible association with Dr. Angelico. In recognition of that and in view of the fact that a substantial portion of Dr. Toonder's career was literally "on the line," it was unreasonable for LVH to have the gaps of inaction between inquiries, as described above. Of particular

note is the gap between the November 10, 1994 letter from Mr. Hart to St. Luke's which appears to have been received back by LVH on November 22, 1994 and then no follow-up inquiry until December 19, 1994. There is also the gap in activity by LVH between December 19, 1994 and January 27, 1995. As to the latter gap, we recognize that LVH was sent a response from St. Luke's dated January 5, 1995 which was received by LVH on January 9, 1995 but even the delay between January 9 and January 27 was, under the circumstances, unconscionable.

It is well to remember that St. Luke's Hospital is located in the same county as LVH and they are only miles apart. When careers are on the line, personal visits could have been attempted, more calls made (Mr. Hart testified that he made one attempt in late February or early March 1995 to call Dr. Saunders but the call was not returned), and messengers used. It is also apparent under the testimony that both Drs. Toonder and Angelico were readily available for meetings with representatives of LVH throughout the entire process.

If LVH had adhered to the bylaws, once it had gathered its information about Dr. Angelico, it could have put the onus back on Dr. Angelico to clear up the "problem" as LVH saw it. Rather, LVH chose to secure the information itself to complete the application. While LVH claims this was a courtesy, this very well may have worked to the detriment of Dr. Angelico. By LVH's proceeding in the fashion that it did, LVH set the pace of getting the information from St. Luke's. As correctly noted by Dr. Angelico, he responded to every request for information made of him. He gave Mr. Hart a general statement as to the incident with the perfusionist in late August 1994. He then submitted an application that he considered complete on November 6, 1994.

The first indication to Dr. Angelico that something was amiss was the December 19 letter from Mr. Hart. The only thing that Mr. Hart requested of Dr. Angelico at that point was "someone at St. Luke's that we can talk to that will confirm that your resignation was due solely to a personality conflict between you and one of the perfusionists and that there were no clinical, behavioral or other professional conduct issues pending at the time of your resignation." That letter ("D-8") actually confirmed for Dr. Angelico that it was LVH that was proceeding with the verification process with the exception of the seeking of the identity of someone at St. Luke's. There was a prompt response by Dr. Angelico with his letter of December 22 but the response could be construed as vague and meaningless. Dr. Angelico was not told, with a follow-up letter or any other method of contact by LVH, that his response about whom should be contacted at St. Luke's was insufficient. The Angelico letter, though, did convey other information to LVH.

The next time that Dr. Angelico was asked for information after the December 19, 1994 letter from LVH was the letter ("D-10") dated January 27, 1995 from Mr. Hart wherein Mr. Hart asked for details of the perfusionist incident. Dr. Angelico correctly notes that this was the first time, some two and one-half months after submitting his application, that he was asked for details of the perfusionist incident. Dr. Angelico responded with those details through his hand-delivered letter ("D-11") of February 13, 1995. This letter prompted the meeting between the attorneys for the hospitals and, ultimately, the March 21, 1995 letter (Exhibit "M" to the answer) from St. Luke's to LVH that LVH used to consider Dr. Angelico's application complete.

The processing of the Angelico application could have been and should have been expedited by LVH by weeks. The responsibility for the pace of the application process was assumed by and set by LVH, a pace that involved gaps of significant periods of inactivity. Had the burden of verification been kept with Dr. Angelico or Dr. Toonder or both, as contemplated by the bylaws, the process would have been expedited considerably as was demonstrated by their prompt responses to any inquiries posed by LVH and their regular prodding and inquiring as to the status of the application.

We also find that LVH's delaying the application process for certain events or information was meaningless to the third party verification requirement, and detrimental to the two physicians awaiting response.

It was the March 21, 1995 letter from St. Luke's that LVH, in the person of Mr. Hart, considered supplying the necessary missing information to make the application complete so that it could proceed to the next step, review by the credentialing committee. LVH argued that this March 21 letter provided new information on three points which gave LVH the necessary third party verification to process the application. We examine the three points.

LVH argued that the March 21 letter for the first time advised LVH that Dr. Angelico was not under the "threat of investigation." This was not new information at all. In St. Luke's response to LVH's November 10, 1994 letter (Exhibit "F" to defendants' answer), St. Luke's responded "no" to the question prepared by LVH: "Are there or have there been any investigations or actions instituted, in process, or pending against him?" Dr. Angelico's December 22, 1994 letter ("D-9") also indicates that there are no "clinical, behavioral or other professional conduct issues pend-

ing," but such statement is self-serving. However, there is yet another statement from St. Luke's, the January 5, 1995 letter ("D-16") wherein Dr. Saunders states: "I can confirm that Dr. Angelico was not under any investigation or evaluation and there was no particular incident to question his competency." To add that "threat of investigation" is different from investigations in process or pending is legal hairsplitting and a distinction without a difference. This argument by LVH loses all weight when one considers that the initial question posed on November 10, 1994 was actually prepared by LVH.

The second new item claimed by LVH in this March 21 letter is that, for the first time, LVH was supposedly hearing that Dr. Angelico's resignation was unilateral. While the word "unilateral" was not used in prior correspondence, there clearly was confirmation from St. Luke's that the resignation by Dr. Angelico was unilateral. The November 10, 1994 questionnaire, drafted by LVH and completed by St. Luke's, indicates: "Were any of this individual's privileges ever denied, reduced, suspended, revoked or resigned (voluntarily or involuntarily)?" That was followed by the explanation that: "Dr. Angelico resigned from our staff. Only he can provide the reasons for his resignation." While this did not answer the specific question as to the moving force for the resignation, the January 5, 1995 letter ("D-16") from St. Luke's answers that question. That letter indicates that Dr. Angelico resigned from the medical staff of St. Luke's. It calls Dr. Angelico's resignation "personal" with the statement that only Dr. Angelico knows the reasons for the submission of the resignation. Finally and significantly, in that letter, it is indicated that "his resignation was not requested by the hospital." That is a clear indication of a unilateral resignation. Thus, LVH knew, in early January 1995, that the res-

ignation was unilateral and did not have to wait until receipt of the March 21 letter.

The third item claimed to be new in this March 21 letter by LVH involves a concern of LVH about a secret agreement pertaining to confidentiality. It is stated in the March 21 letter that Dr. Angelico's personal decision to resign was not the result of any "agreement" involving anyone at St. Luke's. It also indicates that there was no agreement to preclude the provision of any credentialing verification information. Specific comment that there was no agreement to withhold information was herein revealed for the first time. However, that specific question was not asked by LVH in the November 10, 1994 inquiry to St. Luke's, or the December 19, 1994 inquiry to St. Luke's. The January 27, 1995 inquiry is the first request for information pertaining to a confidentiality agreement. That was followed by the conference between the attorneys for the hospitals which generated the March 21, 1995 response from St. Luke's indicating that there was no agreement. Thus, as to this last point, the one and only new point of information received in the March 21 letter was not even requested by LVH until some two and one-half months after Dr. Angelico submitted his application. The March 21 letter simply is not adequate justification for LVH's reclassification of the Angelico application from incomplete to complete so that it can proceed to the next step.

LVH, in sidestepping the bylaws by controlling the pace of the Angelico application investigation rather than by leaving the information gathering to him as required by the bylaws, embarked on a casual, too slow course that continues as this opinion is being prepared. Additionally, the information which LVH claims was not received until late March 1995, and which it insists was necessary to complete the application, was actually

received, in part, much earlier, and, in part, was never even requested until January 27, 1995. We respect LVH's obligation and need for third party verification of competency information but, here, we cannot turn a blind eye to faulty investigation and unnecessary inaction when so much is at stake.

It is clear that Dr. Toonder's surgical career was held in a balance composed of a number of factors including the numerosity requirement, his relationship with LVH, Dr. Angelico's association with LVH and the actual performance of surgery by Dr. Toonder. In arguing that an injunction should not be granted, LVH would hold Drs. Toonder and Angelico to technical compliance with the LVH bylaws. However, LVH has deviated from a technical interpretation of the bylaws as has been seen. The net result is our finding under the evidence that obstacles were unfairly placed in Dr. Toonder's path as he sought to meet the numerosity requirement. The application submitted by Dr. Angelico for the Toonder slot was not given "fair consideration" and was not treated as other applications for clinical privileges are treated. The plaintiff has therefore shown that his right is clear and that the wrong perpetrated by LVH is manifest.

After careful scrutiny of the evidence and the applicable law, we determine that the entry of an injunction is necessary so that LVH is made to comply with the agreement of settlement and release.